DAVID SHONKA
Acting General Counsel

Ethan Arenson, DC # 473296
Carl Settlemyer, DC # 454272
Philip Tumminio, DC # 985624
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2204 (Arenson)
(202) 326-2019 (Settlemyer)
(202) 326-2004 (Tumminio)
(202) 326-3395 *facsimile*
earenson@ftc.gov
csettlemyer@ftc.gov
ptumminio@ftc.gov

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

| | |
|---|---|
| **Federal Trade Commission,**<br><br>    Plaintiff,<br><br>    v.<br><br>**Pricewert LLC also d/b/a 3FN.net, Triple Fiber Network, APS Telecom, APX Telecom, APS Communications, and APS Communication,**<br><br>    Defendant. | Case No. _____<br><br>**CERTIFICATION AND DECLARATION PLAINTIFF'S COUNSEL OF ETHAN ARENSON IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTIONS FOR: (1) TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; (2) ORDER TEMPORARILY SEALING ENTIRE FILE; AND (3) LEAVE TO EXCEED PAGE LIMIT** |

I, Ethan Arenson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am one of the attorneys representing Plaintiff Federal Trade Commission ("FTC" or "Commission") in this action against Defendant Pricewert LLC d/b/a 3FN.net, Triple Fiber Network, APS Telecom, APX Telecom, APS Communications, and APS Communication ("3FN"). My work address is Federal Trade Commission, 600 Pennsylvania Ave., NW, Room H-286, Washington, DC 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, could competently testify thereto.

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff     Page 1 of 11

2. I am a member in good standing of the bars of the District of Columbia and Virginia.

3. I submit this certification and declaration pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Civil Local Rules 7-10, 7-11(a), and 79-5(b)(1) in support of the Commission's *Ex Parte* motions for: (a) Temporary Restraining Order and Order to Show Cause ("TRO Motion"); (b) Order Temporarily Sealing Entire File; and (c) Leave to Exceed the Twenty-Five Page Limit Set by Local Rule 7-2.

4. Pursuant to Fed. R. Civ. Pro. 65(b), this Court may issue a TRO without notice to the Defendant only if the Commission's counsel certifies to the Court "in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed herein, the Commission has not provided the Defendant with notice of the filing of this action or the Commission's motion for a TRO. No Commission employee has communicated with the Defendant. I further certify that the necessity for this emergency hearing has not been caused by a lack of diligence on the Commission's part, but has been brought about only by the circumstances of the case. For the reasons stated below, the interests of justice require that the Commission's applications be heard *ex parte*.

5. The evidence set forth in the Commission's Memorandum of Points and Authorities in Support of its TRO Motion (the "TRO Memo") and the supporting declarations and exhibits demonstrates that the Defendant has engaged in unlawful activities in commerce that are unfair in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (2006). Moreover, the Defendant has designed its business to conceal its identity and the identities of its principals to avoid being held accountable for its unlawful actions.

6. As described in more detail in the Commission's TRO Memo, the Defendant, 3FN, is a rogue Internet Service Provider controlled by overseas criminals that is inflicting significant harm upon U.S. consumers. 3FN is a full service Internet hosting provider that recruits, knowingly hosts, and actively participates in the distribution of, illegal, malicious, and harmful electronic content, including child pornography, malicious software, and the servers

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 2 of 11

1  used to control networks of compromised computers known as botnets.

2      7.    On information and belief, and as described in multiple declarations submitted in support of the TRO Motion illustrate, 3FN hosts a massive amount of content that harms consumers. For example:

- Special Agent Sean Zadig of the National Aeronautics and Space Agency's Office of Inspector General found 3FN hosting: botnet command-and-control servers; websites engaged in the hijacking of users' web browsers; websites engaged in search engine optimization (SEO) ploys (spamming and other techniques used to artificially inflate the ranking of a website); illegal online pharmacies; malware distribution sites; intellectual property theft (MP3 and movie filesharing and downloads); sites featuring investment and currency trading scams; hacking-related sites; rogue anti-virus products; and sites distributing Trojan horses. Zadig Decl., Ex[1]. 1, ¶¶ 12-19 and Att. A.
- Gary Warner, Director of Research in Computer Forensics at the University of Alabama at Birmingham, found 3FN hosting malicious botnet software, apparent child pornography, fake anti-virus products, illegal online pharmacies, and pirated music and software. Warner Decl., Ex. 2, ¶¶ 3-10, 12-13.
- Sarah Ohlsen, of the National Center for Missing and Exploited Children ("NCMEC"), testifies that NCMEC's CyberTiplines received more than 700 reports of child pornography hosted at 3FN. In more than 500 different cases, NCMEC's analysts were able to confirm that the reported websites did indeed contain apparent child pornography. *See* Ohlsen Decl., Ex. 3, ¶ 7. Morever, a review of the reports attached to Ms. Ohlsen's declaration shows that 3FN has consistently hosted child pornography dating back to 2004, and as recently as May 21, 2009. *See* Ohlsen Decl., Ex. 3, ¶ 7 and App. B.

---

[1] All exhibit references are to the exhibits submitted in support of the Commission *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause why a Preliminary Injunction Should Not Issue, filed herewith.

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 3 of 11

- Steve Linford, the founder of the Spamhaus Project, testifies that his organization reported 17 different IP addresses controlled by 3FN between November 2008 and March 2009 that were home to botnet command and control servers. Linford Decl., Ex. 4, ¶ 19. In his view, this is a huge number of command and control servers to be located on any one network in the same time frame, and puts 3FN in the same category as McColo and Atrivo/Intercage – two notorious rogue ISPs that were recently taken offline by their upstream providers. *Id.*

- Andre' DiMino, the Co-Founder and Director of The Shadowserver Foundation, testifies that his organization has records of 311 unique IP addresses controlled by 3FN that participated in, or facilitated, malicious activity over approximately the past year and a half. DeMino Decl., Ex. 5, ¶¶ 13,15. Moreover, those records show that 4,576 unique malicious software programs have used 3FN's servers as a botnet command and control server over that time. DiMino Decl., Ex. 5, ¶ 21. This malware includes programs capable of keystroke logging, password stealing, data stealing, programs with hidden backdoor remote control activity, and programs involved in spam distribution. DiMino Decl., Ex. 5, ¶ 22.

- Dean Turner, of Symantec, testifies that his company's data shows that a large number of IP addresses registered to the Defendant have served as the source of cyber attacks detected by Symantec in the last six months. Turner Decl., Ex. 6, ¶¶ 9, 16-32.

- FTC Investigator, Sheryl Drexler, testifies that in mid-May 2009 she used FTC test computers to visit a series of 3FN-hosted websites that purportedly contained malicious code according to published reports, and in eight different cases her computer was attacked by malicious code hosted by 3FN. Drexler Decl., Ex. 7, ¶¶ 33-34.

8. As the declaration testimony submitted in support of the TRO Motion also illustrates, 3FN has actively solicited at least some of the malicious content that it hosts. Mr.

Warner and Ms. Drexler testify that 3FN advertises its services in banner ads placed on *crutop.nu*, a Russian language website (which is itself hosted by 3FN) that features a variety of discussion forums that focus on making money from spam. Warner Decl., Ex. 2, ¶ 11; Drexler Decl., Ex. 7, ¶ 30. Mr. Warner also testifies that representatives of 3FN are active participants in *crutop.nu* discussion forums. In those forums, an individual who identifies himself as 3FN's "Senior Project Manager" has posted 3,440 messages in the crutop forums. Warner Decl., Ex. 2, ¶ 11. In one exchange between 3FN's Senior Project Manager and a user identified as "Rett," Rett asks if he can host "Rape and Incest sites on 3FN." The response from 3FN: "Yes of course." *Id.*

9. Perhaps even more damningly, the declaration testimony also shows that 3FN has actively participated in the configuration and deployment of botnets. Zadig Decl., Ex. 1, ¶ 6; Drexler Decl., Ex. 7, ¶¶ 27-28.

10. Moreover, the declaration evidence also establishes 3FN's active collaboration with and protection of its clients who are engaged in spam and botnet-related activity. Mr. Linford, of the Spamhaus Project, testifies that his organization has sent 3FN more than 70 abuse reports since 2005 asking 3FN to remove spam-related content from its network. Linford Decl., Ex. 4, ¶ 7. Linford concludes, based on 3FN's interactions with Spamhaus since 2007, that 3FN has demonstrated a consistent "push a pawn" strategy, whereby 3FN feigns cooperation with Spamhaus by temporarily removing offending websites and servers, only to reinstate them shortly after Spamhaus has withdrawn the IP address from its "block" list. Linford Decl., Ex. 4, ¶ 13-18. In several cases, 3FN has moved offending websites to other IP addresses controlled by 3FN, in what Linford believes to be an effort to evade detection by Spamhaus. Linford Decl., Ex. 4, ¶¶ 17-18. Data independently collected by Mr. DiMino's organization, The Shadowserver Foundation, establishes that at least five of the command and control servers reported by Spamhaus – and purportedly taken down by 3FN – were not in fact removed. *See* DiMino Decl., Ex. 5, ¶¶ 24-30.

11. The declarations in this case also make clear that 3FN's principals are not based

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 5 of 11

in the United States, and that the company's operations have been structured in a way that appears calculated to evade the reach of law enforcement. The Defendant is registered as an Oregon Limited Liability Company, but its Oregon address appears to be that of only a registered agent. Its official paperwork lists its principal place of business in Belize. Drexler Decl., Ex. 7, ¶ 23. In its filings, Defendant states that its only members are two Belizean companies, both of which share the same address in Belize as Defendant. *Id.* No individuals, other than an employee of "Registered Agents Ltd.," appear in Defendant's filings. *Id.* Instead, the Defendant appears to operate as a shell company listed on Internet registration applications, and has used several different aliases to conduct its business, including Triple Fiber Network, APS Telecom, APS Communication, APS Communications and APX Telecom. Drexler Decl., Ex. 7, ¶¶ 3-20, 23-25; Linford Decl., Ex. 4, ¶¶ 7,9. Defendant is apparently controlled by principals who operate from eastern Europe. Drexler Decl., Ex. 7, ¶¶ 21-22, 26-27; Linford Decl., Ex. 4, ¶¶ 8-12; Zadig Decl., Ex. 1, ¶ 6; Warner Decl., Ex. 2, ¶ 11. Based on these circumstances and the Defendant's complicity in disseminating harmful content to consumers in the United States and abroad via the Internet, it is highly likely that, absent prompt action by this Court, the Defendant will continue to violate the Federal Trade Commission Act and continue to cause substantial injury to consumers.

12. As described more fully in the accompanying TRO Memo, the evidence establishes that the Commission is likely to prevail on the merits of its action against the Defendant and that the Defendant will be held liable for the consumer injury resulting from its unlawful enterprise. Because of the pervasive unlawful nature of Defendant's business, the Defendant's use of evasive techniques, the presence of easily concealed and readily destructible evidence (i.e., computer servers, remotely accessible via the Internet, and the data they contain), and Defendant's ongoing and flagrant violation of federal law, it is likely that without immediate *ex parte* injunctive relief the Defendant will help perpetuate its clients' unlawful activities by destroying, modifying, or relocating the harmful and malicious code and content that it hosts, destroy business records, conceal evidence of its wrongdoing, and dissipate assets, thus

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 6 of 11

rendering ineffective any restitution this Court may ultimately enter and causing irreparable harm to consumers victimized by the Defendant's activities. Indeed, given the illicit practices detailed in the declaration evidence, 3FN would have great incentive to do so. Therefore, there is good cause to grant the requested relief without notice to Defendants, and for temporarily sealing the docket and entire file until the Defendant is served.

13. As illustrated by the following examples (provided on information and belief), it has been the Commission's experience that defendants who receive notice of the filing of an action by the Commission or of the Commission's intent to file an action alleging consumer fraud, often attempt to undermine the Commission's efforts to preserve the status quo by immediately dissipating or concealing assets and/or destroying documents. Often the defendants or their affiliates, who have been served with a temporary restraining order, attempt to remove assets from their financial institutions or conceal offshore assets:

> a. In *FTC v. Connelly*, SACV-06-701 DOC (RNBx) (C.D. Cal. 2006) the court issued on August 9, 2006 an *ex parte* TRO with an asset freeze against one defendant, but provided notice to the other two individual defendants by issuing an Order to Show Cause as to why their assets should not be frozen. After receiving notice of the court's ruling, all three defendants withdrew at least $800,000, some of which was clearly already subject to the asset freeze.
>
> b. In *FTC v. Universal Premium Services, Inc.*, CV-06-849 SJO(OPx) (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account, which the bank had not yet frozen, hours after he was personally served with an *ex parte* TRO that included an asset freeze.
>
> c. In *FTC v. Physicians Healthcare Development, Inc.*, CV02-2936 RMT (JWJx) (C.D. Cal. 2002), the FTC informed defendants on Monday, April 8, 2002, that the FTC would be filing a complaint and seeking a TRO against them on Wednesday, April 10, 2002. On Wednesday, after filing the case and obtaining the TRO, the FTC faxed a copy of the signed and entered TRO to the

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 7 of 11

defendants at their offices. Upon receiving notice of the TRO, the defendants removed or shredded most of their records and documents, including all customer files.

d. In *FTC v. J.K. Publications, Inc.*, Civ. No. 99-00044 ABC (AJWx) (C.D. Cal. 1999), the FTC obtained an *ex parte* TRO with an asset freeze. The defendants maintained several bank accounts in the Cayman Islands. The defendants did not disclose these assets on sworn financial statements ordered by the court in its TRO and transferred money to these accounts in violation of the TRO.

e. In *FTC v. Intelinet.Com, Inc.*, CV-98-2140 CAS (C.D. Cal. 1998), the FTC obtained an *ex parte* TRO with an asset freeze. The FTC served the TRO on banks where the defendants were known or suspected to have accounts. While the person who was serving the TRO for the FTC was at one of the banks and speaking to a branch manager about the TRO, one of the defendants came into the bank, after having been served with the TRO, and attempted to withdraw money from his account there. He was unsuccessful.

f. In *FTC v. Intellicom*, 97-4572 TJH (Mcx) (C.D. Cal. June 23, 1997), a telemarketing investment fraud case, the FTC obtained an *ex parte* TRO with an asset freeze and knew of 20-30 banks with potential assets. The FTC served the banks as fast as possible with the order, but one defendant, before he could be served, removed $40,000 one hour before the FTC arrived at the bank. Another defendant called his bank that the FTC managed to serve. The defendant asked the manager to wire out the contents of one account frozen by the order. The manager caught the red flag in the system and refused to release the requested $100,000.

g. In *FTC v. World Class Network, Inc.*, No. SACV97-162 AHS (Eex) (C.D. Cal. 1997), after the court issued an *ex parte* TRO with an asset freeze, two

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 8 of 11

of the defendants withdrew from the bank, spent, and/or hid $202,000 in assets after being served with the court order and asset freeze. The spouse of another defendant withdrew over $100,000 and left the state to open and to deposit funds into an out-of-state account.

h. In *FTC v. Fortuna Alliance, LLC*, Civ. No. C96-799M (W.D. Wash. 1997), the FTC obtained an *ex parte* TRO with an asset freeze in May 1996 against the defendants. After service of the order, one employee called to inform other employees located at another office of the order. Representatives from the other office immediately tried to escape with all of the cash and money orders on site. Over one million dollars and business records were found in an employee's station wagon.

i. In *FTC v. Chierico*, No. 96-1754-Civ-Moore (S.D. Fla. 1996), the court issued an *ex parte* TRO with asset freeze. Within hours of service upon the defendant, he and his wife requested issuance of a $500,000 certified check from their joint brokerage account, made payable to her alone. The couple then deposited the certified check into a bank account in the wife's sole name. The Commission learned of the withdrawal from the brokerage firm and presented the bank with sufficient evidence for it to freeze the wife's account.

j. In *FTC v. Lopinto*, No. CV S-93-561 (LDG) (D. Nev. 1993), a case involving the telemarketing of prize promotions, the district court issued an *ex parte* TRO with an asset freeze in June 1993. The order was served on a bank where one of the defendant businesses maintained an account. However, before the bank could implement the freeze, an agent of the defendant business (who knew of the freeze) withdrew $12,300 from defendant's account.

k. In *FTC v. American National Cellular, Inc.*, No. CV 85-7375 WJR (C.D. Cal. 1985), a case involving the fraudulent telemarketing of investments, the court issued a TRO with an asset freeze on November 12, 1985. A defendant

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff   Page 9 of 11

learned of the court's ruling, and he immediately withdrew $1.2 million from his bank accounts before the banks were served with a copy of the freeze order. The defendant fled California and dissipated the money while living overseas.

l. In *FTC v. Osborne Precious Metals, Inc.*, No. CV 92-4194 AWT (C.D. Cal. 1992), an investment fraud case, the court issued an *ex parte* TRO on July 15, 1992. The receiver and his representatives effected service of the order the following day, first at defendants' offices in Los Angeles and an hour later at defendants' offices in Las Vegas. The receiver discovered that a number of business records in the Las Vegas offices had been destroyed shortly before his representatives arrived to secure the premises.

m. In *FTC v. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), a telemarketing fraud case, a district court denied the Commission's request to issue an *ex parte* TRO with asset freeze, and scheduled a noticed hearing on the relief sought. Several days later, the Commission served notice of its action and the upcoming hearing. Within hours, an individual defendant withdrew approximately $200,000 from one of his bank accounts, thereby making it difficult for the Commission to preserve those funds for consumer redress.

n. In *FTC v. Academic Guidance Services*, No. 92-3001 (AET) (D.N.J. 1992), a case involving the fraudulent telemarketing of business opportunities, the defendants discovered that the Commission intended to file its case against them (and seek an *ex parte* TRO) the following week. An informant told the Commission that the defendants then leased a document shredder and spent the weekend destroying documents. The Commission verified that a shredder had been leased, and one of defendant's employees confirmed that documents had been shredded.

o. In *FTC v. Applied Telemedia Engineering and Management, Inc.*, No. 91-635 (S.D. Fla. 1991), another telemarketing fraud case, the defendants were

1  advised, pursuant to an agreement with the Commission, that the Commission had
2  filed its complaint and intended to seek a TRO with an asset freeze from the
3  court. When the Commission's agents went to defendants' offices to serve
4  process, they observed defendants removing boxes of documents from the
5  premises. The Commission moved for, and received, an *ex parte* TRO the
6  following day.

7  14.  For the reasons stated above, as contemplated by Federal Rule of Civil Procedure
8  65(b), there is good cause to believe that immediate and irreparable damage will result to
9  consumers from the relocation of the malicious code and content that Defendant hosts, from
10 dissipation of Defendant's assets, and from the concealment, transfer, or destruction of the
11 Defendant's records if the Defendant receives advance notice of the Commission's application
12 for a temporary restraining order. Thus, the Court should enter the requested TRO without
13 notice to the Defendant.

14  15.  For the same reasons, there is good cause to believe that immediate and
15 irreparable harm will result to consumers if the Defendant receives premature notice of the filing
16 of this action or any of the motions filed herein. Thus the Court should grant the Commission's
17 *Ex Parte* Motion for Order Temporarily Sealing Entire File and the Commission's *Ex Parte*
18 Motion for Leave to Exceed the Twenty-Five Page Limit Set by Local Rule 7-2.

20  I declare under penalty of perjury that the foregoing is true and correct.

22  Executed on May 29, 2009 in Washington, DC.

24  *[signature]*
    Ethan Arenson, Attorney
25  Federal Trade Commission

Fed. R. Civ. P. 65(b) Decl. Of Plaintiff    Page 11 of 11